*Thurman, C. J.
The main questions discussed in these - cases, are of more than usual importance, and deserved to be, and were, very ably argued by counsel. Their decision involves not ■ only the cases before us, but a multitude of others; not only the validity of the statute here drawn in question, but that of many more; not merely the correctness of legislative action, but also the extent of judicial power.
By the sixteenth section of the second article of the constitution, it is provided,, among other things, in reference to legislative proceedings, that “ every bill shall be fully and distinctly read, on three different days, unless, in case of urgency, three-fourths of the house in which it shall be pending, shall dispense with this rule.” And “ no bill shall contain more than one subject, which shall be clearly -expressed in its title.”
Eor the plaintiffs, it is contended that this section of the consti•tution was disregarded by the assembly in passing the act under consideration, in this, that the bill was not read on three different days, or even three different times, although such readings were not dispensed with by a three-fourths vote; and hence it is argued the . act. is necessarily void.
Assuming, for the present, without so deciding, that this question" arises upon the records, and that the journals of the assembly may be looked at to ascertain the facts, I come at once to the questions, wliat are the facts ? and what is their effect upon the validity of the .act ? The facts supposed to be material, are, that the bill originally introduced, after being read twice, and on different days, was com *480 mitted to a select committee, who reported it back with one amendment, to wit: “strike out all after the enacting clause and insert a-, new bill;” that on a subsequent day, April 12th, this amendment, after being itself amended, was agreed to, and the bill, as amended ordered to be engrossed and read a third time to-morrow; that on the morrow (April 13th), it was “read the third time” and passed, and having afterward passed the house, and been duly enrolled, was • signed by tbe-*presiding officers of the two houses, filed in [480 the proper office, and published among the laws.
From these facts, it aj>pears, says the plaintiffs’ counsel, “ that the ‘ new bill,’ which finally passed the senate, was read but once in that body.” It would be more accurate to say that but one reading of the amendment is recorded, for it does not affirmatively appear that it was read but once. On the contrary, it might fairly be presumed, if presumptions are admissible to supply defects in the journal, that it was read three times, and upon different days. For it was reported on March 27th, and laid upon the table and ordered to be printed; on April 17th, taken up, committed to the whole senate, and reported back with various amendments, all which were considered and agreed to ; on the same day, committed to the committee on the judiciary, and by that committee, on April 12th, reported back with-eight amendments, which were also considered and agreed to; afterward, and on the same day, amended- still further, and thereupon: ordered to be engrossed and read a third time the next day; then the vote ordering the engrossment reconsidered, the amendment (the so-called “new bill”), “ as amended by the senate,” agreed to, and the bill, thus amended, ordered to be engrossed and “ read a third time on to-morrow;” and, accordingly, it was engrossed, and on the next day, “ read the third time and passed.” Senate Journal, 340, 401, 408, 425, 431, 432, 438. And, as before stated, after it .had passed both houses, it was signed, as the constitution requires, filed among the proper archives, and duly published as-a law.
Now, presumptions are every day made, to support the proceedings of the courts, far more liberal than would be a presumption that this so-called “ new bill ” was read on three days, and it is difficult to perceive why the proceedings of the assembly are not entitled to as much favor as the doings of the courts. The latter-are as much bound as the former to keep a record, or journal, and no one will pretend that legislative records should be more full and *481, 482 481] perfect than ^judicial. If a strict, literal, compliance with every constitutional requirement, however minute, is necessary to the validity of a law, and the courts are bound to hold that nothing was done but what appears in the legislative journals, it is easy to demonstrate that not a single statute enacted since the constitution took effect, can be upheld. It is nowhere stated in the journals that any reading of a bill was full and distinct, although the constitution requires that every reading shall be so. But surely this omission does not vitiate every act that has been passed, and make it the duty of the courts to hold them null and void. Everybody, I suppose, would admit that the reading being stated, the fullness and distinctness thereof may be presumed. If so, why may not three readings, and on different days, be presumed, when to do so contradicts nothing in the journal, but, on the contrary, is entirely ■ consistent with it ? In the case before us, the journal of April 13th expressly says that the bill in question was that day “ read the . third time ” and passed. This imports that it had previously been read twice, and as the journal shows that it was considered on March '27th, when the amendment called a “new bill” was reported, and again on the 7th and 12th of April, why may it not be presumed that there were two prior readings on two of these three days ?
But, for argument’s sake, let it be admitted that the bill as amended was read but once in the senate; is the act for that reason void ? That, counting the two readings before the amendment, and the final reading, the bill was read three times, is conceded, for -these readings are shown by the journal, and it is also conceded that, in general, three readings of an amendment are not necessary. But inasmuch as the amendment in this case is styled in the journal a “ new bill,” it is said that three readings were necessary. Why necessary ? The amendment was none the less an amendment because of the name given it. It is not unusual, in parliamentary proceedings, to amend a bill by striking out all after the 482] enacting clause and inserting a new bill. Jefferson’s *Manual, sec. 35. When the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended ■bill three times, and on different days; but when there is no such vital alteration, three readings of the amendment .are not required.
Now, in the case before us, we have no means of knowing what •was the change effected by the amendment in question. Neither ‘bill nor amendment is spread upon the journal, and unless we were *483 to run into the absurdity of receiving parol proof and trying the validity of a statute upon the testimony of witnesses, we could not say that any substantial change was made. Eor aught that we have before us, or can properly look at, the “ new bill ” may have been, with the exception of a single word, and that not material, identical with the matter stricken out.
Nor is it to be forgotten that every reasonable intendment is to ■be made in favor of the proceedings of the legislature. It is not to be presumed that the assembly, or either house of it, has violated the constitution; when, therefore, it appears by the journals that a bill was amended by striking out all after the enacting clause and inserting a “ new bill,” so called, and but one reading after the .amendment is recorded, it can not be presumed that the matter inserted was upon a different subject from that stricken out, especially when the matter inserted is consistent with the title borne by the bill before the amendment. This is the more obvious and reason.able since the constitution provides that, “No bill shall contain more than one subject, which shall be clearly expressed in its title.” Art. 2, sec. 16.
On the whole, we find nothing in the journal that would warrant us in holding that the amendment in question was of a character requiring it to be read three times.
Another view of this subject remains to be presented:
A statute may, upon its face, be repugnant to the constitution, and therefore void, no matter how regular may have been the steps by which it was enacted. And although the power was at one time very seriously denied, yet it is no *longer to be doubted [483 that the courts are bound to treat such a statute as a mere nullity.
But the case is quite different where no such repugnancy appears in the act itself, and its validity is assailed upon the ground that it was not passed in the mode prescribed by the constitution. By the term “mode,” I do not mean to include the authority in which the law-making power resides, or the number of votes a bill must receive to become a law. That the power to make laws is vested in the assembly alone, and that no act has any force that was not passed by the number of votes required by the constitution, are nearly, or quite, self-evident propositions. These essentials relate to the authority by which, rather than to the mode in which, laws .are to be made.
Now, to secure the careful exercise of this power, and for other *484 good reasons, the constitution prescribes or recognizes certain things' to be done in the enactment of laws, which things form a course or mode of legislative procedure. Thus we find, inter alia, the provision before quoted, that “ every bill shall be fully and distinctly read on three different days, unless, in case of urgency, three-fourths of the-house in which it shall' be pending shall dispense with .this rule.” This is an important provision, without doubt; but, nevertheless, there is much reason for saying that it is merely directory in its-character, and that its observance by the assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts. Any other construction, we incline to think, would lead to very absurd and alarming consequences. If it is in the power of every court (and if one has the power every 'one has-it) to inquire whether a bill that passed the assembly was “fully” and “ distinctly " read three times in each house, and to hold it invalid if upon any reading a word was accidentally omitted, or the reading was indistinct, it would obviously be impossible to know what is the statute law of the state. Now, the requisition that bills-shall be fully and distinctly read, is just as imperative as that re-484] quiring them *to be read three times, and as both relate to-the mode of procedure merely, it would be difficult to find any sufficient reason why a violation of one of them would be less fatal to an act than a violation of the other.
And here it is to be observed, that the difficulty is not avoided by the rule in 5 Ohio, 363, which forbids a contradiction of the journal by parol proof; for, as we have seen, the journal is uniformly so made up that it would not be contradicted by proof that the reading of a bill was not distinct.
But whether the constitution, in the particular under consideration, is merely directory or not, it can not be gainsaid. It seems tons, that where the journals show that a bill was passed, and there is nothing in them to show that it was not read as the constitution requires, the presumption is that it was so read, and this presumption is not liable to be rebutted by proof. If it be said, as was said in the argument, that this leaves the assembly at liberty to disregard the constitution, the answer is obvious, that a disposition to disregard it is no more to be imputed to the legislative than to the judicial department of the government, and ought not to be imputed to either. The members of both departments take an oath to support that instrument, and we are not at liberty to assume that the *485 sense of duty and of the obligation of an oath is weaker in the one than in the other. True, the courts are made the judges in the last resort of the constitutionality of all laws, and, as before remarked, where -a statute is on its face plainly unconstitutional, it is their duty so to declare it; but it does not necessarily follow that they are authorized to supervise every step of legislative action, and inquire into the regularity of all legislative proceedings that result in laws.
It is next contended by the plaintiffs in error, that “the act prohibits the sale of intoxicating liquors to be drunk at the place where sold, and it therefore violates section 18 of the schedule to the constitution,” which section reads as follows: “No license to traffic in intoxicating liquors shall ^hereafter be granted in this state, [485 but the general assembly may by law provide against the evils resulting therefrom.”
The latter clause of this section, say counsel, “ is clearly a limitation of the power of the general assembly, under which they may not prohibit such sale, but may pass laws providing against the evils resulting therefrom.”
It is further contended, that “ the first, second, third, fourth, and eighth sections of the act are unconstitutional. They work, in their practical operations, a complete prohibition upon the sale of intoxicating liquors in the State of Ohio. In the first place, they deny the right to sell in any quantity, to be drunk in, upon, or about the building, etc., where sold. In the second place, the second section prohibits altogether the sale to minors. In the third place, the third section interdicts the sale to persons intoxicated, etc. In the fourth place, the fourth section denounces the place where liquors may be sold, as a - common nuisance. But it goes a step further, and declares that all places where intoxicating liquors are sold in violation of the act shall be shut up and abated. Thus it will be seen that the law, in terms, prohibits the sale alto-together, as far as the place, and as far as certain persons are concerned.”
In support of these views, counsel, in addition to the section before quoted from the schedule, cite the first, nineteenth, and twentieth sections of the bill of rights, by which it is declared, among other, things, that all men have the inalienable right of “acquiring, possessing, and protecting property;” that “private property shall ever be held inviolate, but subject to the public wel *486, 487 fare,” and that “this enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people.”
We are unable to perceive that either of these provisions of the constitution, or any of its other provisions, is violated by the law. in question. In saying this, we by no means affirm that the legis486] lature has the power to wholly prohibit ^traffic in intoxicating liquors. Without deciding what, if any, authority over this subject can be derived from the general grant of legislative power in section 1 of article 2 of the constitution, we hold that the act before us is authorized by the express grant of power in section 18 of the schedule already quoted; for the law is not prohibitory, nor does it interfere, in any degree, with any right of property. It belongs to that class of legislative acts commonly called “ police laws,” and is framed with a view to regulate, and not to destroy. It seeks to do, by constitutional means, what the assembly is expressly authorized to do, provide against the evils resulting from /the traffic in intoxicating liquors. One of the greatest of these •evils is the congregation of idle and dissolute persons at j>laces where liquors are sold and drunk; hence the sale of liquor to be •.drunk at the place where sold, is prohibited. Another evil is the ^ale to minors and persons intoxicated, or in the habit of getting •intoxicated; hence, the sale to the former is prohibited, except •upon the order of their parents, guardians, or family physicians, and the sale to the latter is prohibited altogether. And inasmuch •as the habitual violation of these provisions does, in fact, create a nuisance, it is declared to be one in law, and authority is given, not 4o abate any man’s house, but to abate the nuisance that exists •thereat.
The idea apparently contended for, that the constitution recognizes an uncontrollable, illimitable right to sell intoxicating liquors, •is,manifestly erroneous. There is no such right in respect to any commodity, however harmless; for, if there were, how could the various inspection laws, the laws relating to markets, the license laws, the Sunday law, etc., be sustained? A power of regulation, a power to provide against evils incident to traffic, a power to project community against the frauds or dangerous practices of trade, is, in a greater or less degree, vested in every government, and certainly the people of Ohio are not wholly without this protection. -487] If to guard .against these evils, some restraint upon *the *488 traffic itself is necessary, it may lawfully be' imposed, the fact being always borne in mind, and always acted upon, that the power is a power to regulate, and not to destroy. To this power intoxicating liquors are expressly subjected by the constitutional provision I have quoted; but were that provision stricken out of the constitution the power would yet subsist; and for the same reason that it might be declared unlawful to sell poison to a child, or a dagger to a madman, it might be made an offense to sell intoxi-' eating drink to a minor or a drunkard; and for the same reason that any other common nuisance might, by law, be abated, the business of a common tippling-house might be subjected to that fate.
In the present cases, and others submitted with them, numerous questions arise upon the statute under consideration. In regard to these questions, I shall do little more than state our conclusions, and refer generally to the authorities cited by counsel. It would extend this opinion to a vei’y inconvenient length were I to go fully into the reasons that bring us to these conclusions. We hold as follows: ■
1. A violation of either the first, second, or third sections of the act subjects the offender to the penalties mentioned in the first clause of section 8. It is not necessary, in order to incur these penalties, that all three sections be violated.
2. If a sale violate all three sections, the offender may be prosecuted under either of them; and his conviction or acquittal will bar a prosecution, for the same sale, under either of the other two sections.
3. But a conviction or acquittal under the first, second, or third sections, is no bar to a prosecution under the fourth.
4. To convict for a violation of the second section, it is necessary to aver in the information, and prove on the trial, that the seller knew the buyer to be a minor; and to convict for a violation of the third section, it is necessary to aver and prove, in like manner, that the seller knew the buyer to be intoxicated, or in the habit of getting intoxicated. Birney’s case, 8 Ohio, 237.
*5. To convict for a violation of the fourth section, it is nec- [488 essary to aver in the information, and prove on the trial, that the place where the liquor was sold was a place of public resort; and the proof must also show that it was a place where liquors were habit7 uaJly sold in violation of the act.- A single sale does not make the *489 place a nuisance, or tbe seller a “ keeper,” within the meaning of the act. A series of sales is necessary.
6. No order to shut up or abate the place can rightfully be made, unless the nuisance continues to exist at the time such order is made. Unless, therefore, the court is satisfied that, at the time of making the order, the place is kept for the sale of liquors in violation of the act, no order should be made. For it is the unlawful-business, and not the place,per se, that creates the nuisance; and hence, where the business has ceased, there is no nuisance to abate. No man’s property can be forfeited as a punishment for crime, the constitution providing that no conviction shall work a “ forfeiture of estate.” Art. 1, sec. 12. Hence there is no power to deprive a man of the use of his property, unless it be necessary in order to •abate an existing nuisance.
7. The order is not to be directed to any officer. It is not an order to be executed by an officer. It is an order to the person convicted; obedience to which may be enforced, if the nuisance be continued, by attachment for contempt of court. The order being made, if the convict cease to keep a house of public resort of the character named or referred to in the fourth section, he need give no bond; and having so ceased, 'no attachment can properly be issued against him. But if he desire to continue keeping such house of public resort, he must, in order to avoid an attachment, give bond. He has his election to quit keeping a house of public resort, or to give bond and keep it without violating the law.
8. The following information is sufficient in law:
“ The State of Ohio, Clermont County, ss:
“ Probate court, May term, in the year of our Lord one thousand eight hundred and fifty-four: John Johnston, prosecuting attorney of the State of Ohio, for the said county of Clermont, 489] *now here in said probate court, in and for said county, in the name and by the authority and on behalf of the said State of Ohio, information makes, that on the second day of May, in the year of our Lord one thousand eight hundred and fifty-four, and from that day until the commencement of proceedings herein, to wit, on the twenty-third day of May, in the year aforesaid, at the said county of Glermont, in the said State of Ohio, one Frederick Miller was and has been unlawfully the keeper of a room of public resort, whore intoxicating liquors were and have been then and there sold by said Frederick Miller in violation of an act of the general assembly of the State of Ohio, entitled ‘ an act to provide against the evils resulting from the sale of intoxicating liquors in *490 the State of Ohio,’ and passed by said general assembly on the .first day of May, in the year aforesaid, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio. John Johnston,
“ Prosecuting Attorney of Clermont County.”
9. A prosecution under this act can not be commenced in the probate court. It must be commenced before a justice of the peace or mayor. But no very strict conformity between the information and the original complaint is necessary. If the charge is substantially the same in both, there is no room to quash the information on the ground of variance. The proper rule upon this point has already been stated at this term in Gates and Goodno v. The State.
10. Nul tiel record is not a proper replication to the plea of former conviction prescribed in the probate code ; for there is no proferí of a record in the plea. The proper replication is a general denial of the allegation of the plea ; and the issue thus made up is to be tried by the jury impaneled in the cause.

Judgments and orders reversed.